ALBERTINE ABEL, Administratrix, v. BUTLER-RYAN COMPANY.[1]

July 24, 1896.

Nos. 9954—(256).

Injury to Employé—Vice Principal—Negligence—Question for Jury.

On the evidence introduced on the trial of this case, which was a personal injury action, it is *held* that the questions as to whether either or both of two foremen in defendant's employ were vice principals at the time of the accident, and whether such accident resulted from the negligence of either or both of said foremen, were for the jury.

Appeal by plaintiff from an order of the district court for Ramsey county, Egan, J., denying a motion for a new trial. Reversed.

*Humphrey Barton*, for appellant.

*P. J. McLaughlin*, for respondent.

COLLINS, J.[2]  Action by plaintiff, as administratrix, to recover for injuries received by her intestate while in defendant's employ as a common laborer, from which injuries he died. At the close of plaintiff's testimony the court instructed the jury to return a verdict in defendant's favor.

The facts, as shown by the evidence, were as follows:  Defendant corporation was erecting a large building, and had brought the basement wall to its full height. On this wall the joists for the first floor had been placed, and a rough floor laid. It then became necessary to lower a large iron tank from this floor to the basement, and, to do this, three skids were placed with the upper ends resting on the floor at the edge of an opening which extended to the south wall of the basement, 15 or 20 feet distant, and the lower ends on the ground below, no basement floor having been laid. The plan was to slide the tank down these skids, and, to prevent its striking and wedging against the wall when it reached the ground, skids were laid with the upper ends on the top of the wall and the lower on the ground, intersecting or intercrossing the skids first mentioned three or four feet from the ground. These skids were placed in position by a gang of men at

work on the building but under the immediate supervision of their foreman, Emmett Butler.

About this time his brother, Cooley Butler, the foreman of another gang of men also at work on this building, appeared, and from that time seems to have had actual charge of the lowering. He directed that a chain be passed about the tank, which weighed about 4,000 pounds, and connected with block and tackle, so as to hold it as it descended. As it was started down the skids the latter held the "snub rope" which controlled the block and tackle. The tank had been lowered a short distance on the skids, when it was stopped, and Cooley Butler, handing the rope to one of the men, stepped over to the top of the wall, directly opposite the tank, and noticed the skids which had been placed to prevent its striking the wall. Thinking that it would be easier to put the tank in place if these skids were dropped so as to lie flat on the ground, he suggested to Emmett that this plan be adopted, and, when the edge of the tank rested on them, those used for sliding it down could be pried out of the way, and, by means of the block and tackle, the tank easily lowered so that it would rest upon the skids which had been dropped to receive it. At this time the hour for quitting work had been reached, and most of the men had started home,—only those remaining who were actively at work upon the tank.

This plan was agreed upon, and, turning to the men, Cooley Butler ordered that two or three of their number go down into the basement, pull the skids down, and let them lie. Although the order was given by Cooley Butler, it was, to all intents and purposes, that of both foremen. Thereupon plaintiff's intestate and another workman went around by a basement door, while one Conners slid down the skids, reaching the ground first. That Cooley Butler knew that three men had gone to obey his order is apparent from his testimony. Emmett Butler was not called upon as a witness, but that he knew, or ought to have known, that the three men had started to do the work, is also apparent.

Conners pulled down the skids, as directed, before the other men got there, by going under those on which the tank rested, and pulling by the ends,—the most feasible plan to promptly accomplish the work, and quite as safe a method as could be adopted, for he would be quite as safe under the tank as in front of it. The skids were

66 M.—2

flat on the ground when the other men reached the place, but a piece of joist lay partly across them. It appeared that this joist had been lying across the skids while they were in their first position, but for what reason was not shown. Evidently thinking that this should be removed, Abel, the plaintiff's intestate, stepped partly under the standing skids, and seized hold of the joist. Just before this Cooley Butler gave an order to lower the tank. It descended about one foot, when the skids slipped, the tank partly fell, and Abel received the injuries from which he died. It seems that Butler gave the order to lower without paying the slightest attention to the whereabouts of any of the men except Conners, and, while he testified that he thought the latter was out of the way, it appears that Conners only escaped injury by jumping after he noticed that the skids were slipping.

Under these circumstances, the questions presented—a verdict for defendant having been directed—are two: First, was it for the jury to determine whether either or both of the Butlers were vice principals of the defendant master, or fellow servants of the intestate? Second, if they were vice principals, was Cooley Butler negligent when he gave the order to lower the tank? We are of the opinion that both of these questions should have been submitted to the jury.

It was quite as much the duty of the master to see to it that the skids were properly placed before the workmen—nothing but common laborers—undertook the difficult and dangerous task of sliding the heavy tank down into the basement, as it was to furnish proper and sufficient material with which to do the work itself. This was understood, apparently, for the skids were put in position under the immediate supervision and direction of the foreman Emmett Butler. Another foreman seems to have then taken charge, and at his suggestion a chain was put around the tank, so that it might be controlled by block and tackle to which the chain was attached,—an additional means of safety. Subsequently to this, and after the lowering process had commenced, the three men were sent to the basement, there to do a thing which naturally brought them into a place of exceedingly great danger, should the skids give way, or the tank fall. This was upon the order of the foreman who had assumed charge of the work, by consent of the other foreman, and while the intestate was in this dangerous place the accident happened. We

need not repeat the rule so often laid down by this court, by which to ascertain when an employé becomes the representative of the master as to other employés. But under this rule the first question above noted was for the jury.

And, as to the second, it was for the jury to determine, if they found either or both of the Butlers to have represented the master in this hazardous undertaking, whether or not there was negligence in giving the order to lower the tank without notifying all the men who had gone into the basement to stand out of the way, or at least to exercise some degree of care to ascertain that they were not in danger. The fact that Cooley Butler waited to give the order until he saw the skids lying down upon the ground was not conclusive upon this question of negligence. A new trial must be had.

Order reversed.

CANTY, J. (dissenting). I agree with the majority that it was error to order a verdict for the defendant in this case, and that the question of defendant's liability was for the jury. But I cannot agree with them as to the principles on which the case should have been submitted to the jury.

Cooley Butler was not a general manager or general officer of the defendant. He was simply a foreman, having power to hire, discharge, and oversee a gang of laborers. Whether he was acting within the scope of his authority, in leaving his own crew and coming over and taking charge of the crew of Emmett Butler, was, under the circumstances, a question for the jury. The principle involved is much the same as that in Voyer v. Dispatch Printing Co., 62 Minn. 393, 64 N. W. 1138. But the majority hold that, if Cooley Butler was acting within the scope of his authority, he was a vice principal, for whose negligence the master is liable. On just what principle they hold this, except one that is so beautifully indefinite as to be no principle at all, I have never been able to understand. But we have already discussed this question quite fully in two former cases (Blomquist v. Chicago, M. & St. P. Ry. Co., 60 Minn. 426, 430, 62 N. W. 818, and Carlson v. Northwestern T. E. Co., 63 Minn. 428, 435, 65 N. W. 914), and I will do as I did in those cases,—"go it alone."

In my opinion, the question of whether the foreman was a vice principal, as to the inferior servant killed, depends on the amount of

disparity that, under the circumstances, existed between the inferior servant and a competent foreman.    The plaintiff's intestate was a common laborer.    The work was of a character which the jury would be justified in finding required for its safe performance a high degree of skill in the foreman, and but little skill in the inferior servants under him, and that the deceased was not employed to exercise, was not paid for exercising, and was not expected to exercise the degree of skill necessary for his own protection, but it was the duty of the foreman to protect him.    If the jury found these facts, and found also that the deceased was killed by reason of a danger from which he should have been so protected, then the conditions called for a higher degree of responsibility on the part of the master, and the foreman was a vice principal, for whose negligence the master is liable.

As I stated in my dissenting opinion in the Blomquist Case,[3]

"It is a beautiful theory of law which requires him [a common laborer], out of his wages, of perhaps one dollar per day, to hire an expert whose services are worth five or ten dollars per day, to inspect these temporary appliances for him, and inform him as to their safety."

And further:[4]

"It is often the case that the inferior servant is more familiar than such foreman with the dangers to which he is exposed, and is better able to protect himself from those dangers than the foreman is to protect him; and yet without his fault, and by reason of exposure to those dangers, he may be injured through the negligence of the foreman.    When the inferior servant knows and appreciates the dangers to be avoided, and is as well, or nearly as well, able to care for himself as the foreman is to care for him, he is substantially on an equal footing with the foreman, and in a better position than the master to look out for his own safety.    In such a case the foreman is not a vice principal, but he and the inferior servant are fellow servants.    *    *    *    It is very often the case that the prosecution of the work requires a very high degree of skill and experience in the foreman, and but little skill or experience in the inferior servant, who is neither hired nor paid to exercise the skill necessary for his own protection.    If the position of the foreman is one which requires of him superior knowledge or skill, which cannot be required or expected of the inferior servant, but which is necessary for the protection of such inferior servant, then, in regard to the exercise of such

[3] 60 Minn. 432.                              [4] At page 433.

superior knowledge or skill, the foreman is a vice principal. * * * There must be something more in the inequality of the foreman and inferior servant than that which results alone from the one having the authority to hire, discharge, and oversee the other. It is the actual disparity or inequality between them which should control; and the disparity which gives the foreman the character of vice principal must be substantial, not merely slight. As far as I am able to discover, after much investigation, there are but two kinds of this disparity: (1) Disparity of knowledge; and (2) disparity of skill. * * * Disparity of skill is where the foreman has, or should have, skill which the inferior servant neither has nor can be expected to have, the want of which skill on the part of such servant causes or contributes to his injury. The existence of such disparity of either or both kinds is a question of fact for the jury, and the burden is on the party asserting such disparity to prove it."

In the case now before us the disparity was not disparity of knowledge, but of skill. The deceased could see the physical conditions which surrounded him as well as the foreman could; but by reason of the want of skill he might not know or appreciate the dangers that existed, and which the foreman should know and appreciate. As applied to the case of infant employés, the courts have long recognized this principle of disparity, and hold that it is the duty of the master to instruct an inexperienced minor, and warn him as to the danger connected with his employment, and to use reasonable care to protect him from the same; that the foreman charged with these duties is a vice principal, for whose negligence the master is liable. See Barg v. Bousfield, 65 Minn. 355, 68 N. W. 45; Kaillen v. Northwestern Bedding Co., 46 Minn. 187, 48 N. W. 779; Wood, Mast. & Serv. (2d Ed.) p. 750, § 366. When employed in one kind of work, common laborers may be full-grown men, competent to take care of themselves; when employed in another kind of work, they may be mere children, having little or no conception or appreciation of the dangers connected with their employment.

A very instructive illustration of this is the case of McElligott v. Randolph, 61 Conn. 157, 22 Atl. 1094, where the plaintiff's intestate was employed to do extra work one night in removing from the wheel pit of the factory a large wheel weighing 12 tons, which was being taken out. The foreman remained until midnight, superintending the work, and then went away, leaving directions for its further prosecution. By reason of the want of any person sufficiently

skilled to direct the work during the rest of the night, said intestate was killed. The court say: [5]

"The work was one of some difficulty and required the exercise of mechanical skill. * * * These men [the laborers] were not skilled or trained in mechanical work. With competent instructions, oversight and direction, however, they were competent to perform the work. Otherwise they were incompetent."

The court held the master liable for the reason that the foreman abandoned his post. But I submit that this is no sufficient reason, if, as that court holds, the master has washed his hands of all responsibility when he has furnished safe instrumentalities, a safe place in which to work, a competent foreman, and competent fellow servants. The master, before the injury, had no notice, either actual or constructive, that the foreman intended to or did abandon his post; and I can see no difference between a foreman wrongfully and negligently abandoning his post, and remaining, but negligently performing, or failing to perform, his duty. But the case illustrates the manner in which many courts holding to the same general rule in this class of cases, will squirm to avoid the effect of that rule in a very harsh case, and then make haste in the next case to explain away and overrule the decision so made, as that court did in the case of Sullivan v. New York, N. H. & H. R. Co., 62 Conn. 209, 25 Atl. 711, where it was held that where a common unskilled laborer on a section was injured by the negligence of the foreman of the section gang in failing properly to superintend the thawing out of dynamite used in blasting, whereby it exploded, the master was not liable. Under the rule for which I contend, it was in that case clearly a question of fact for the jury whether or not there existed sufficient disparity between the foreman and the inferior servant as to the danger there in question, to constitute the foreman a vice principal.

In my dissenting opinion in the Blomquist Case, in discussing the case of Brown v. Winona & St. P. R. Co., 27 Minn. 162, 6 N. W. 484, where a common laborer in a wrecking crew was injured by the negligence of the road master, I said: [6]

"These servants are usually common laborers, possessed of but little skill or experience in the unusual and temporary employment for

[5] At page 160.    [6] At page 441.

which they are thus suddenly called together, and are wholly at the mercy of the foreman, who should possess skill and experience."

In my concurring opinion in the Carlson Case I claimed that, on the bill of exceptions, the evidence of disparity between the foreman and inferior servant injured was so conclusive that the court could hold, as a question of law, that the foreman was a vice principal. But in the case now before us, I am of the opinion that it is not thus conclusive, but is a question for the jury; that the jury should be instructed to determine—First, whether Cooley Butler was acting within the scope of his authority in taking charge of that work; and, if they so found, then, second, whether such substantial disparity existed between him and the deceased, and, if they found that it did, then they should hold such foreman to be a vice principal; and in that case they should, as a third step, find whether he was guilty of negligence causing or contributing to the death of the deceased.

START, C. J. (concurring). I concur in the conclusion reached in this case, on the ground that if the work, in the execution of which the plaintiff's intestate was assisting as the servant of the defendant, was of such a character that ordinary care required the giving of proper orders as to its execution, so as to insure the safety of the workman (and I think it was), the giving of such orders was the absolute duty of the defendant. Whoever was authorized to give such orders was a vice principal. It is the duty and the right of the master, in such cases, to give proper orders; and the duty of the workmen, whether they know more or less than the person giving the orders, to obey, unless it be obvious to them that such obedience will expose them to unusual and unnecessary dangers. Carlson v. Northwestern T. E. Co., 63 Minn. 428, 65 N. W. 914. I am of the opinion that in the case at bar the authority of the person giving the orders, and whether he was guilty of negligence in the premises, resulting in the death of the plaintiff's intestate, were questions which should have been submitted to the jury.